Citation Nr: 1829619 
Decision Date: 06/27/18 Archive Date: 07/02/18

DOCKET NO. 94-02 783 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Roanoke, Virginia


THE ISSUES

1. Entitlement to service connection for a lung disorder.

2. Entitlement to a total disability rating based on individual unemployability (TDIU) prior to August 31, 1981, on an extraschedular basis.

3. Entitlement to an effective date earlier than September 3, 1997, for increased special monthly compensation (SMC).


REPRESENTATION

Appellant represented by: Betsy H. Sochar, Attorney


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

C. J. Houbeck, Counsel


INTRODUCTION

The Veteran served on active duty from June 1957 to March 1961 and from April 1961 to August 1977.

These matters come before the Board of Veterans' Appeals (Board) from multiple rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Roanoke, Virginia. In December 1997, the RO denied entitlement to service connection for multiple disabilities and an issue characterized as "entitlement to a total rating from the date of military retirement."

The Veteran indicated that he disagreed generally with this decision in a December 1997 letter. In a December 1998 decision, the Board noted generally that issues had arisen during the course of the appeal that had not been developed for appellate review and were therefore referred to the RO for appropriate action. In April 2000, counsel for the Veteran and VA filed a Joint Motion with the United States Court of Appeals for Veterans Claims (Court) to vacate and remand the portion of the December 1998 Board decision which it interpreted as referring to the RO a TDIU claim, because, given the Veteran's timely notice of disagreement (NOD), the Board should have remanded rather than referred that claim. In an April 2000 Order, the Court granted the Joint Motion. The Board remanded the claim pursuant to the Joint Motion in November 2000. The Board characterized the claim as a claim for a TDIU.

In April 2003, the Board issued multiple decisions with regard to claims including some of those listed above. In relevant part, the Board granted an application to reopen a claim for service connection for a lung disorder. In February 2004, counsel for the Veteran and VA filed a Joint Motion with the Court to vacate and remand the April 2003 Board decision with regard to TDIU, which had been recharacterized as a claim for a TDIU prior to August 12, 1993, the date from which the Veteran had subsequently been granted a 100 percent schedular rating. In a February 2004 Order, the Court granted the Joint Motion.

In separate March 2005 decisions, the Board remanded the TDIU and lung disorder claims. 

In addition, in January 2009, the RO granted entitlement to increased SMC. The Veteran timely challenged the effective date assigned. 

In March 1996, the Veteran testified at a hearing before a decision review officer (DRO); a transcript of that hearing is of record. In April 2010, the Veteran was unable to appear for a scheduled Board hearing, but the Veteran's then attorney representative presented arguments on his behalf. The transcript of that proceeding is of record. 

In relevant part a subsequent May 2011 Board decision also granted entitlement to TDIU from June 23, 1986, until August 12, 1993, and remanded the issue of entitlement to TDIU prior to June 23, 1986. The May 2011 Board decision otherwise remanded the above claims. 

The effective date for the grant of increased SMC was September 10, 2007, at the time of the May 2011 Board remand. However, a September 2011 rating decision determined that an effective date of September 3, 1997, should be established for the Veteran's increased SMC. A veteran is generally presumed to be seeking the maximum benefit allowed by law and regulation, and a claim remains in controversy where less than the maximum available benefit is awarded. AB v. Brown, 6 Vet. App. 35 (1993). In this case there is somewhat contradictory evidence as to whether the Veteran is satisfied with the effective date assigned for his increased SMC claim. On the one hand, the Veteran has been generally consistent in claiming that his SMC benefits should extend back to the time of his separation from service in 1977 or, at the least, to 1981. By contrast, in an April 2013 statement, the Veteran specifically stated he "is not contesting the 100% Service Connection with Aid and Assistance [f]or (a) blindness[,] (b) PTSD[, (c)] degeneration of the bones in the neck, back arms and [l]egs[,] (d) hearing loss[,] (e) radiation cystis [sic] in the urinary track[,] (f) radiation colitis and TDIU." The Board does not find the above April 2013 statement a clear intent on the Veteran's part to withdraw his claim for an earlier effective date for increased SMC benefits, especially given other clear statements regarding his intention to pursue earlier effective date claims for TDIU and tinnitus (which the Veteran often has used interchangeably with "hearing loss"). Therefore, the claim for an effective date for increased SMC prior to September 3, 1997, remains on appeal to the Board.

Subsequent to the May 2011 Board decision and remand, the Veteran requested another Board hearing. Consequently, a Board hearing was scheduled in May 2013. After receiving notification, the Veteran indicated that he would be unable to attend the hearing in person, but indicated that his designated representative, the American Legion, would "represent the veteran." The Veteran's representative failed to make an appearance at the scheduled Board hearing without the Veteran being present, which is consistent with 38 C.F.R. § 20.700(a) (2017) that indicates that a hearing will not normally be scheduled solely for the purpose of receiving argument by a representative unless good cause for so doing is shown. In this case, the Veteran and his representative have made no argument contending that there is good cause for a hearing for the purpose of accepting argument from the Veteran's representative. Instead, since the scheduled May 2013 Board hearing the Veteran and his representative have submitted numerous written documents setting forth the Veteran's contentions, which is specifically noted to be the preferred method for submitting evidence and argument in the absence of the Veteran. See id. In light of the foregoing, the Board considers the Veteran's request for a Board hearing to be withdrawn. See 38 C.F.R. § 20.700(e). 

The Veteran's claims were remanded by the Board in August 2013. Subsequently, a December 2014 rating decision granted entitlement to an effective date of August 31, 1981, for TDIU. The rating decision concluded that this constituted a complete grant of benefits on appeal. As will be discussed below, however, the Veteran has consistently claimed (both before and after the December 2014 rating decision) that entitlement to TDIU should be effective from August 10, 1977, the day following his separation from service, as he filed a claim for benefits within one year of separation. As such, the issue remains on appeal.

The Board again remanded the claims in March 2016 for additional development. As the requested development was completed, the Board finds that there has been substantial compliance with its directives. Stegall v. West, 11 Vet. App. 268, 271 (1998). In reaching that determination, the Board notes that the November 2014 advisory opinion referenced in the March 2016 Board remand does not appear to have been associated with the claims file; however, a July 2017 memorandum from the Director, Compensation Service, has been obtained and associated with the claims file to replace the missing advisory opinion. Moreover, the Board notes that the December 2014 rating decision noted that the advisory opinion concluded only that entitlement to TDIU was warranted on an extraschedular basis from August 31, 1981, the currently assigned effective date. Thus, there is no indication that the missing memorandum includes evidence favorable to the Veteran's pending claim. Based on the foregoing, the Board concludes that the July 2017 advisory opinion effectively serves the same purpose as the missing memorandum and that the Board may proceed with a decision based on the new advisory opinion.

In March 2017, a Motion for Reconsideration as to the March 2016 Board determination was denied.

Following an August 2017 Supplemental Statement of the Case (SSOC) the Veteran submitted additional relevant evidence; however, in August 2017 he specifically waived consideration by the RO of any additionally submitted evidence and requested that the matter be considered by the Board. As such, the Board may proceed with adjudication of the claim without prejudice to the Veteran.

In that regard, pursuant to 38 C.F.R. § 14.629(b), no individual may assist claimants in the preparation, presentation, and prosecution of claims for VA benefits as an agent or attorney unless he or she has first been accredited by VA for such purposes. Given VA's multiple attempts to correct the deficiencies in the Veteran's choice of representation and the private attorney's failure to comply, the Board will proceed with the Veteran as not represented.

As discussed in its prior determinations, the Board also recognizes that the issues addressed in a separate May 2011 Board remand, specifically (1) entitlement to fee basis outpatient chelation therapy and (2) entitlement to payment for reimbursement of medical expenses associated with treatment by Community Memorial Hospital (CMH), CMH Emergency Physicians, and South Hill Internal Medicine for the period from February 8, 1997 to February 17, 1997, have not been recertified to the Board by the Richmond, Virginia RO and, as they are the subject of separate RO jurisdiction they will not be adjudicated herein. That said, the Board notes that in recent correspondence, most recently in January 2015, the RO has contended that these issues were not in appellate status. The Veteran has correctly apprised the RO of the outstanding nature of these claims. The issues remain in remand status in the electronic Veterans Appeals Control and Locator System (VACOLS) and have not been readjudicated and/or recertified to the Board. As such, the January 21, 2015, notification from an unnamed RO to the Veteran indicating that a timely notice of disagreement as to the above issues had not been received clearly was in error.

This appeal was processed using the Veteran's Benefits Management System (VBMS) and Virtual VA paperless claims processing systems. Accordingly, any future consideration of the Veteran's case should take into consideration the existence of these electronic records.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2017). 38 U.S.C. § 7107(a)(2) (2012).


FINDINGS OF FACT

1. A lung disability was not incurred in service and is not otherwise related to service, to include as a result of exposure to radiation, mustard gas, herbicides, or other toxins.

2. For the period from March 27, 1981, the Veteran's service-connected disabilities precluded him from securing and following a substantially gainful occupation.

3. For the period prior to March 27, 1981, the Veteran's service-connected disabilities did not preclude him from securing and following a substantially gainful occupation.

4. It is not factually ascertainable that the Veteran met the criteria for a higher level of SMC based on aid and attendance prior to September 3, 1997.


CONCLUSIONS OF LAW

1. A lung disability was not incurred in or aggravated by service. 38 U.S.C. §§ 1101, 1110, 1112, 1113, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.307, 3.309, 3.311 (2017).

2. For the period from March 27, 1981, the criteria for entitlement to a TDIU have been met. 38 U.S.C. § 1155, 5107 (2012); 38 C.F.R. §§ 3.340, 3.341, 4.16(a) (2017).

3. For the entire period prior to March 27, 1981, the criteria for entitlement to a TDIU have not been met, to include on an extraschedular basis. 38 U.S.C. § 1155, 5107 (2012); 38 C.F.R. §§ 3.340, 3.341, 4.16(a) (2017).

4. An effective date earlier than September 3, 1997, for the award of a higher level of SMC based on aid and attendance, is not warranted. 38 U.S.C. §§ 1114, 5110 (2012); 38 C.F.R. §§ 3.151, 3.155, 3.350, 3.352, 3.400 (2017).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duty to Notify and Assist

As noted above, the Veteran was afforded a hearing before the undersigned Acting Veterans Law Judge (AVLJ) during which he presented oral argument in support of his claims. Here, the undersigned clarified the issues on appeal and made inquiry as to the existence of outstanding evidence. The AVLJ specifically discussed potential evidence that would support the Veteran's claims and to the extent that such evidence was not explicitly discussed at the time it was detailed in multiple subsequent remands for the needed evidence. The actions of the AVLJ supplement the VCAA and comply with 38 C.F.R. § 3.103 (2017).

Neither the Veteran nor his representative has otherwise identified any shortcomings in fulfilling VA's duty to notify and assist. See Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). For the above reasons, the Board finds the duties to notify and assist have been met, all due process concerns have been satisfied, and the appeal may be considered on the merits.

Service Connection

Service connection may be established for disability resulting from personal injury suffered or disease contracted in the line of duty in the active military, naval, or air service. 38 U.S.C. §§ 1110, 1131. 

In addition to the foregoing, the Veteran also has asserted exposure to radiation as a result of nuclear detonation tests. That said, the Veteran's claimed condition does constitute a disease specific to radiation-exposed veterans pursuant to the requirements of 38 C.F.R. § 3.309(d) or a radiogenic disease pursuant to 38 C.F.R. § 3.311(b)(2)(i). As such, entitlement to service connection on a presumptive basis due to in-service radiation exposure is not warranted. Instead, consideration of the claim based on radiation exposure requires the Veteran to have, "cited or submitted competent scientific or medical evidence that the claimed condition is a radiogenic disease" (i.e. a disease that may be induced by ionizing radiation). 38 C.F.R. § 3.311(b)(4) (2017). 

The Board notes, notwithstanding the foregoing presumptive provisions, the United States Court of Appeals for the Federal Circuit (Federal Circuit) has held that a claimant is not precluded from establishing service connection where entitlement on a presumptive basis is not warranted, as long as there is proof of direct causation. See Combee v. Brown, 34 F.3d 1039, 1043-1044 (Fed. Cir. 1994). To establish a right to compensation for a present disability on a direct basis, a Veteran must show: "(1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service." Davidson v. Shinseki, 581 F.3d 1313, 1315-16 (Fed. Cir. 2009); Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

The Veteran contends that he has a lung disability that was incurred during service. He asserts that there is documentation of coughing up blood in service. He maintains that at the time of his separation from service, he was concerned about two nodules and a density in the right lung, but VA failed to properly test for tuberculosis (which was later diagnosed in 2012). He alleges that VA misdiagnosed him, and subsequently lost his in-service records. The Veteran also has claimed that the lung problems are due to in-service asbestos, mustard gas, and/or radiation exposure.

The Veteran's service treatment records include a February 1964 report of coughing up blood since mid-December. There had been fine traces of blood in the sputum for the previous two weeks. There had been a larger amount that morning that was brown and bright red. There was chest pain and the Veteran was noted to smoke one pack per day. The chest was clear on examination. In September 1969, the Veteran was seen for pain in the right upper quadrant that increased with deep breathing and coughing. A chest x-ray was clear and the impression was right-sided pleurisy. 

Post-service records include multiple lung diagnoses years after separation from service, including bilateral bronchopneumonia, pulmonary fibrosis, and bacterial pneumonia.

The Veteran was afforded a VA examination in June 2012. The examiner noted a diagnosis of chronic obstructive pulmonary disease (COPD) from the 1980s. There was a noted history of smoking. The examiner detailed the Veteran's reports of in-service hemoptysis (coughing up blood) that resolved, but indicated that a record documenting the report could not be found. Currently, the Veteran experienced shortness of breath that required the constant use of oxygen. The physician opined that it was less likely as not that any present lung disorder had its onset during, or was otherwise caused by, military service. The VA examiner considered the Veteran's claim that he had a lung disorder that developed because of radiation exposure while onboard ship 30 miles from testing near Christmas Island (OPERATION DOMINIC). The physician noted there was no acute radiation poisoning found in the service treatment records and no complaint of a lung condition until many years after the claimed remote exposure. These post-service treatment records showed diagnoses of obstructive lung disease (COPD). However, as stated above, the physician rendered a negative opinion in terms of relating this disability to the Veteran's active service, or any potential radiation exposure. 

An August 2012 VA treatment record indicated that the Veteran's lung problems were consistent with a mycobacterium avium-intercellulare (MAI) infection. A February 2013 CT scan showed an increase in multifocal micropulmonary nodules and cystic fibrotic changes in the lungs consistent with an atypical infection such as a fungal infection. This finding was consistent with prior studies. The diagnoses also included mycobacterium avium complex (MAC) pulmonary disease; severe COPD; dyspnea, multifactorial; and lung nodules. The Veteran has interpreted this finding as consistent with radiation fibrosis. The Veteran was started on MAC treatment that involved triple antibiotic therapy. The Veteran has submitted statements indicating his belief that he incurred this unusual infection as a result of military service in Africa.

In support of his claim, the Veteran submitted a March 2017 private treatment record that indicated CT findings that were concerning for radiation changes throughout the chest (thickened pericardium, thickened esophagus, and diffuse lung nodularity). The assessment was COPD, chronic kidney disease, and a reported history of toxoplasmosis and record indicated that the Veteran had "a history of chest radiation from military exposure."

The Veteran was afforded an April 2017 VA examination. The examiner noted review of the claims file and diagnoses of COPD, mycotic lung disease, and bronchiectasis, all "many years ago." The Veteran stated, "I was involved in top secret nuclear testing" (now it[']s no longer top secret per his report) in 1962. There was heavy fall out of radiation onto the ship and crew on several occasions according to the Veteran. The Veteran was on a "decontamination team" that stayed topside on several occasions to keep radiation from going throughout the ship. He hosed down and scrubbed the deck. The Veteran alleged that the Duke University hospital concluded that he had radiation-induced disease and radiation burns to the lungs. The Veteran also alleged that he was exposed to mustard gas in 1957 during training at Bainbridge, Maryland and was exposed to asbestos on ships and in boiler rooms from 1958 onward, as well as being attached to a crew building ships. Following examination, the examiner concluded that it was less likely than not that the respiratory disabilities were caused by or the result of service. The rationale noted that the June 20[1]2 VA examination report had given a negative opinion as to whether the lung problems were related to radiation exposure and that there was no documentation of radiation exposure or acute radiation poisoning in the claims file. As to the February 1964 complaints of cold, cough, and chest congestion, contemporaneous evaluation showed swollen tonsils and bilateral enlarged lymph nodes that more likely than not represented bronchitis or an upper respiratory infection that was acute in nature and resolved entirely. Such an incident was not reflective of radiation poisoning. Another February 1964 record documented coughing up blood, which was consistent with bronchitis. The examiner explained that the Veteran smoked half a pack of cigarettes per day and that tobacco use could cause coughing and that heavy coughing could cause blood in sputum. As to the September 1969 documentation of pain with deep breathing and coughing that was diagnosed as right-sided pleurisy, the examiner explained that pleurisy involved some pain in the chest and the Veteran's symptoms were most likely due to a viral respiratory infection. The examiner found it extremely significant that a September 1969 x-ray of the chest was read as negative, meaning there was no pathology. Based on a literature search and the evidence of record, the examiner concluded that the cause of the Veteran's COPD was smoking. As to the diagnosed bronchiectasis, the cause was a past history of infection and that the one or two isolated in-service infections were unlikely to have caused bronchiectasis. This conclusion was supported by the September 1969 x-ray that was normal, where in instances of bronchiectasis there were areas of abnormal lung and thickened irregular airway walls. As to the diagnosed MAC, MAC infection could be seen in patients with chronic bronchitis and bronchiectasis and was associated with tobacco use. Finally, the examiner was unable to provide a link between the Veteran's claimed radiation, mustard gas, and asbestos exposure based on the evidence of record.

Thus, the Veteran has current diagnosed lung disabilities. As such, the critical question is whether the disabilities were incurred in or are otherwise related to his active service, including exposure to radiation and other toxins. Based on the evidence of record, the Board concludes they were not.

In reaching that conclusion, the Board finds the April 2017 VA examination report of significant probative value. The examiner's opinions were based on an interview of the Veteran, his reported medical history, and physical examination. Further, a complete and thorough rationale was provided for the opinions rendered. The examiner specifically concluded that the Veteran's COPD was due to smoking and not due to any radiation exposure in service. As to the bronchiectasis, the cause was a past history of infection, but not the in-service infections. The rationale for that determination was the normal September 1969 x-rays, which would have shown evidence of bronchiectasis should it have been present as a result of the in-service infections. Finally, the MAC infection was attributable to some combination of the Veteran's smoking history and/or chronic bronchitis or bronchiectasis and not to his service. The examiner otherwise was unable to link the Veteran's claimed in-service radiation, mustard gas, or asbestos exposure to his current disabilities. The Board finds these examination report findings to be the most probative evidence of record as to whether the Veteran's lung disabilities were incurred in service or are otherwise related to service, to include his claimed in-service radiation exposure. 

The Board also has considered the Veteran's contentions that his lung disabilities were caused by his radiation, mustard gas, and/or asbestos exposure or to some other incident of service. In this regard, the Board acknowledges that the Veteran is competent to give evidence about what he experienced, such as coughing and other lung symptoms. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). In addition, the Board recognizes that lay persons are competent to provide opinions on some medical issues. See Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011). Given the Veteran's lack of demonstrated medical expertise and the complexity of linking the etiology of lung disease to radiation exposure or other incident of service, however, the Board concludes that in this case his statements regarding any such link are not competent evidence. As such, the Board affords significantly greater probative weight to the conclusions of the above VA examiner. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007) (explaining in footnote 4 that a veteran is competent to provide a diagnosis of a simple condition such as a broken leg, but not competent to provide evidence as to more complex medical questions). The reason for this is that the VA examiner has medical training, reviewed the history, conducted an examination, and provided a medical opinion supported by a rationale.

The Board also has considered the numerous documents the Veteran has submitted pertaining to radiation exposure and its effects. Even were the Board to presume in-service radiation exposure as claimed by the Veteran, the information provided is too general in nature to link the Veteran's specific lung disabilities to any in-service incident. As such, the Board finds the medical evidence specific to the Veteran of substantially greater probative value.

Similarly, the lay evidence regarding in-service radiation exposure is insufficient to link any of his current lung disabilities to any incident of service and is substantially outweighed by the medical evidence of record.

In conclusion, the April 2017 VA examiner reviewed the Veteran's medical history, interviewed the Veteran, and offered a detailed rationale for the opinions. The Board finds this the most probative evidence of record and ultimately outweighs the Veteran's lay representations as to the etiology of his lung disorders. There is no credible evidence of record that any medical professional has linked the Veteran's current lung disabilities directly to his service, to include radiation exposure therein. In light of the foregoing, the Board finds that the preponderance of the evidence is against the claim, and the benefit of the doubt doctrine is not for application. See generally Gilbert v. Derwinski, 1 Vet. App. 49 (1990); Ortiz v. Principi, 274 F.3d 1361 (Fed Cir. 2001). The appeal must therefore be denied.

TDIU prior to August 31, 1981

It is the established policy of VA that all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. 38 C.F.R. § 4.16 (2017). A finding of total disability is appropriate "when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation." 38 C.F.R. §§ 3.340(a)(1), 4.15 (2017).

Total disability ratings for compensation may be assigned, where the schedular rating is less than total, when the Veteran is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that if there is only one such disability, such disability shall be ratable as 60 percent or more and if there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more and sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. § 4.16(a).

Where these percentage requirements are not met, entitlement to benefits on an extraschedular basis may be considered when the Veteran is unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities, and consideration is given to the Veteran's background, including his employment and educational history. 38 C.F.R. §4.16(b). The Board does not have the authority to assign an extraschedular total disability rating for compensation purposes based on individual unemployability in the first instance. Bowling v. Principi, 15 Vet. App. 1 (2001). In determining whether unemployability exists, consideration may be given to the Veteran's level of education, special training, and previous work experience, but it may not be given to his or her age or to any impairment caused by nonservice-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19 (2016).

In this case, the Board notes that the Veteran is in receipt of TDIU benefits from August 31, 1981, pursuant to a December 2014 rating decision. As such, the Board will limit its consideration to entitlement to TDIU prior to that date. For that time period, the Veteran's service-connected disabilities included left eye old chorioretinitis, rated as 30 percent disabling for the entire appellate time period; right hip degenerative joint disease, rated as 10 percent disabling from March 14, 1978; balanitis, eroitica obliterans, leukoplakia, status post meatal stricture and chronic prostatitis, rated as 20 percent disabling prior to July 1, 1981, and as noncompensable from that date; and status post fistulectomy with external hemorrhoids and residual scarring, rated as noncompensably disabling. As such, the Veteran's combined rating was 40 percent prior to March 14, 1978; 50 percent from March 14, 1978, to July 1, 1981; and again as 40 percent from that date. None of the exceptions contained in 38 C.F.R. § 4.16 are applicable. (The regulation addresses one or both upper extremities or one or both lower extremities, rather than a combination of all extremities. In addition, the disabilities are not of a single system.) Therefore, the Veteran's service-connected disabilities did not meet the percentage rating standards for TDIU for any period on appeal. 38 C.F.R. § 4.16(a). 

Thus, for the period on appeal the Board must now consider whether the evidence reflects that the Veteran's service-connected disability rendered him unemployable prior to August 31, 1981. 

In June 1975, during service, the Veteran had right eye visual acuity of 20/25 and left eye visual acuity of 20/400. The treatment provider was unable to measure depth perception due to the decreased visual acuity in the left eye. The Veteran reported that he previously had obtained commercial driver's licenses in the Commonwealth of Virginia, but that in 1972 he was unable to pass that test. In January 1976, the Veteran was fit with eyeglasses that improved his right eye visual acuity to 20/20. In December 1976, the Veteran reported changes in night vision and the development of tunnel vision, which were not demonstrated on examination. Visual acuity was unchanged. 

In his original January 1978 claim for VA compensation benefits, he reported that he was not employed. 

The Veteran was afforded a VA examination for his eyes in March 1978. At that time, visual acuity in his left eye was correctable to 20/400 in the left eye and 20/20 in the right eye. During a March 1978 examination for his orthopedic problems, the Veteran had slight degenerative changes to the right hip on x-ray and reports of right hip and leg pain, but no loss of motion on examination. Reflexes were normal, muscle strength was normal, and there were no sensory changes.

A March 1978 Social and Industrial Survey noted that the Veteran was starting a hardware store after trying a number of jobs that "he did not like, partly due to interpersonal problems." At present, the Veteran was not making any profit with his business, but believed that there was a possibility of success and planned on giving the venture about 2 years to see what happened. The evaluator concluded, "The combination and extent of this veteran's medical and psychological problems are difficult to assess; but some effect upon his social and industrial capacity can be assumed."

In December 1979, the Veteran was hospitalized for several days for gradually decreasing function of the prostate. 

In November 1980, the Veteran was seen by a physical therapist for his orthopedic problems that the Veteran described as deterioration of the bone due to nuclear radiation in 1962.

An October 1980 letter from a private ophthalmologist noted that the Veteran had corrected right eye visual acuity of 20/20 and barely 20/400 for the left eye. Visual field on the right was normal, but there was constricture on the left with no demonstrable central scotoma.

By the time of a March 27, 1981 VA examination, the Veteran had left eye corrected visual acuity of hand motion only and right eye corrected visual acuity was 20/40. A VA genitourinary examination from the same date noted a history of chronic prostatitis and urethral stricture with urethroplasty in 1975. There was a history of voiding complaints. Following examination, the impression was chronic prostatitis by history.

A November 1981 private optometric report documented a normal right eye visual field with corrected visual acuity to 20/20 and left eye visual acuity that was sensitive only to hand motion with marked constriction of the left visual field. A subsequent November 1981 optometric report, by contrast, indicated that the Veteran had a right visual field no greater than 20 degrees and that a visual field of 20 degrees or less is considered a legal blind condition with 20/20 visual acuity. Moreover, the left eye visual field was too difficult to even measure. 

As noted, a December 2014 rating decision granted entitlement to an earlier effective date for the grant of TDIU effective August 31, 1981. The rationale was that a November 1986 determination from the Social Security Administration (SSA) indicated that the Veteran was unemployable due to his disabilities (which are service-connected by VA) commencing August 31, 1981.

An undated advisory opinion regarding extraschedular consideration for a TDIU under 38 C.F.R. § 4.16(b) prior to August 31, 1981, from the Director, Compensation Service, is of record. (The memorandum appears to be from July 2017.) The memorandum noted the Veteran's service-connected disabilities prior to August 31, 1981, and that the combined rating at 40 percent did not meet the schedular criteria for TDIU. The memorandum concluded that entitlement to TDIU prior to August 31, 1981, was not warranted on an extraschedular basis due to the left eye old chorioretinitis, right hip degenerative joint disease, balanitis and chronic prostatitis, or hemorrhoids. The Veteran's left eye had better visual acuity prior to 1981, which would afford him a greater ability for occupational activity. Specifically, in 1975 visual acuity was 20/25 in the right and 20/400 in the left, whereas by 1981 it had decreased to 20/40 in the right and to hand motion only in the left eye. The letter specifically noted, "The evidence of record shows the Veteran's left eye to have greater visual acuity prior to 1981 indicating a greater ability for occupational activity." There was no evidence to support an increased rating for any of the service-connected disabilities prior to August 31, 1981, as the Veteran had no problems with daily activities of life. In addition, there were no unusual or exceptional disability patterns demonstrated that would render application of the rating criteria as impractical.

Irrespective of the July 2017 conclusions of the Director, Compensation Service, the Board notes that in Kuppamala v. McDonald, 27 Vet. App. 447 (2015) the Court of Appeals for Veterans Claims held that an extraschedular decision by the Director, Compensation Service, is one of fact that is reviewable by the Board on a de novo basis and that the Board may assign an extraschedular rating when reviewing either a grant or a denial of an extraschedular rating by the Director. 

The Board concludes that an effective date of March 27, 1981, for the grant of entitlement to TDIU is warranted. As noted in the above July 2017 advisory opinion, the Veteran's visual acuity significantly worsened in 1981 and this was a primary basis for the 1986 SSA determination of unemployability. The RO used the date assigned by SSA for the effective date of the TDIU, August 31, 1981; however, the medical evidence first demonstrates the worsening of the Veteran's visual acuity at the March 27, 1981, VA examination. As such, the Board concludes that an effective date for the TDIU is warranted from that date. 

The Board also concludes that an effective date for the award of TDIU prior to March 27, 1981, is not warranted. The Board acknowledges that the worsening visual acuity demonstrated at the time of the March 27, 1981, VA examination almost certainly did not have its onset on the date of the examination, but as there is no clear evidence of when the visual acuity worsened, the Board finds that the examination date when the worsening acuity was first documented represents the most appropriate effective date. Prior to that date, the medical evidence demonstrated correctable visual acuity of 20/20 in the right eye with a normal visual field. The evidence also indicates that the Veteran owned a hardware store, which clearly indicates that he believed his visual acuity was adequate for work purposes. To the extent that such a venture was unsuccessful, there is no evidence to suggest that it was the Veteran's visual acuity difficulties or other service-connected problems that prevented its success. To the extent that the Veteran was unemployed for other periods between separation from service and March 27, 1981, the Veteran's normal right eye visual acuity, hip pain with full range of motion, and other service-connected difficulties would not have been of such severity as to preclude employment. He clearly would have been able to perform any number of work roles given such symptoms, including many forms of sedentary employment. 

Again, the Board finds that an effective date of March 27, 1981, is warranted for the Veteran's TDIU award. The Board acknowledges that the Veteran's service-connected disabilities had some effect on his occupational functioning for the period prior to March 27, 1981. However, the ratings assigned during that period recognize the industrial or commercial impairment resulting from his disorders. Nevertheless, for the reasons and bases set forth above, the preponderance of the evidence is against finding his service-connected disabilities (singly or in combination) were of such severity so as to preclude his participation in any form of substantially gainful employment prior to March 27, 1981. 

SMC prior to September 3, 1997

The Veteran is currently in receipt of SMC based on the need for aid and attendance, effective March 17, 1981. He is also in receipt of a higher rate of SMC, at the "intermediate" level, based on the criteria listed in 38 U.S.C. § 1114(p) and 38 C.F.R. § 3.350(f)(3), effective August 12, 1993. Finally, the Veteran is in receipt of a higher rate of SMC at the rate equal to subsection (n) from September 3, 1997, and at the intermediate rate between subsection (m) and subsection (n) on account of blindness in both eyes having only light perception or less in combination with bilateral deafness rated at 10 or 20 percent disabling from September 3, 1997. The Veteran is seeking an effective date earlier than that date for the award of a higher rate of SMC based on the need for aid and attendance. As noted in the above Introduction, it is unclear as to the precise date the Veteran claims that the higher level SMC is warranted or even if such a claim is in appellate status. Out of an abundance of caution, however, the Board will consider whether SMC at the higher rate is warranted for the period prior to August 3, 1997. 

SMC is an additional level of compensation paid to veterans above the basic levels of compensation for various types of losses or levels of impairment solely due to service-connected disabilities. It reflects recognition by VA that certain disabilities, either alone or in combination, have an impact on a veteran beyond the impairment of earning capacity, which is central to the Rating Schedule. 38 C.F.R. § 4.1. Because it considers the interactive effects of multiple disabilities, a determination of the correct SMC award level requires layering of different entitlements. Basic levels of SMC are listed at 38 U.S.C. § 1114(k). Additional levels of SMC are provided in 38 U.S.C. § 1114(l) through (t). Only the additional levels pertinent to the Veteran's claim are discussed herein. 

Determinations as to the need for aid and attendance are based on the actual requirements of personal assistance from others. In determining the need for regular aid and attendance, consideration will be given to the inability of the veteran and his or her spouse to dress or undress themselves, or to keep clean; frequent need of adjustment of any prosthetic which by reason of the disability cannot be done without aid; inability of the veteran or his or her spouse to feed themselves; inability to attend to the wants of nature; or incapacity, physical or mental, which requires care or assistance on a regular basis to protect themselves from the hazards or dangers of the daily environment. See Turco v. Brown, 9 Vet. App. 222 (1996).

The SMC rate payable under 38 U.S.C. § 1114(l) is warranted if the Veteran, as the result of service-connected disability, has suffered the anatomical loss or loss of use of both feet, or of one hand and one foot, or is blind in both eyes, with 5/200 visual acuity or less, or is permanently bedridden or with such significant disabilities as to be in need of regular aid and attendance.

The SMC rate payable under 38 U.S.C. § 1114(m) is warranted if the Veteran, as the result of service-connected disability, has suffered the anatomical loss or loss of use of both hands, or of both legs with factors preventing natural knee action with prostheses in place, or of one arm and one leg with factors preventing natural elbow and knee action with prostheses in place, or has suffered blindness in both eyes having only light perception, or has suffered blindness in both eyes, rendering such Veteran so significantly disabled as to be in need of regular aid and attendance.

The SMC rate payable under 38 U.S.C. § 1114(n) is warranted if the Veteran, as the result of service-connected disability, has suffered the anatomical loss or loss of use of both arms with factors preventing natural elbow action with prostheses in place, has suffered the anatomical loss of both legs with factors that prevent the use of prosthetic appliances, or has suffered the anatomical loss of one arm and one leg with factors that prevent the use of prosthetic appliances, or has suffered the anatomical loss of both eyes, or has suffered blindness without light perception in both eyes. 

With respect to the higher level of SMC awarded to the Veteran, SMC at the (p) rate may be awarded - among other reasons - for the presence of additional disabilities, not involved in other SMC determinations, which are rated as 50 percent disabling. Such an award creates "entitlement to the next higher intermediate rate or if already entitled to an intermediate rate to the next higher statutory rate under 38 U.S.C. § 1114." 38 C.F.R. § 3.350(f)(3). Put another way, the (p) rate affords "a half-step" increase in the level of compensation. The disability or disabilities independently ratable at 50 percent or more must be separate and distinct and involve different anatomical segments or bodily systems from the conditions establishing entitlement under 38 U.S.C. § 1114(l) through (n). 38 C.F.R. § 3.350(f)(3). 

In addition, under 38 C.F.R. § 3.350(f)(2) an intermediate or "half-step" is warranted based, in relevant part, on blindness in connection with deafness. Subsection (f)(2)(v) provides:

Blindness in both eyes having only light perception or less, or rated under subparagraph (2)(iii) of this paragraph, when accompanied by bilateral deafness (and the hearing impairment in either one or both ears is service-connected) rated at 10 or 20 percent disabling, will afford entitlement to the next higher intermediate rate, or if the veteran is already entitled to an intermediate rate, to the next higher statutory rate under 38 U.S.C. § 1114, but in no event higher than the rate for (o).

38 C.F.R. § 3.350(f)(2)(v).

In this case, the Veteran did not have blindness in both eyes without light perception or any of the other criteria for SMC at the (n) rate prior to September 3, 1997. Indeed, the Veteran did not meet the criteria for SMC at the (n) rate as of September 3, 1997. Instead, entitlement was warranted based on the intermediate or "half-steps" available pursuant to 38 C.F.R. § 3.350(f)(2)(v) and (f)(3). Specifically, from September 3, 1997, the Veteran met the criteria for SMC at the (m) rate (i.e. blindness in both eyes) and intermediate steps under subsections (f)(3) [blindness in both eyes having only light perception with additional disabilities independently ratable at 50 percent or more] and (f)(2)(v) [blindness in both eyes having only light perception or less when accompanied by bilateral deafness (and the hearing impairment in either one or both ears is service-connected) rated at 10 or 20 percent disabling]. 

For the period prior to September 3, 1997, the Veteran met the criteria for an intermediate step under subsection (f)(3). The Veteran, however, did not meet the criteria for an intermediate step under subsection (f)(2)(v). In that regard, a January 2009 rating decision granted entitlement to service connection for a bilateral hearing loss disability and assigned a 10 percent disability rating, effective August 17, 2007. A May 2011 Board determination granted entitlement to an effective date of September 3, 1997, for the grant of service connection for a bilateral hearing loss disability. A September 2011 rating decision effectuated the Board's grant of an effective date of September 3, 1997, for the grant of service connection for the bilateral hearing loss disability. Thus, as the criteria for an SMC rating at the (n) rate is dependent on the Veteran's effective date for the grant of entitlement to service connection for a bilateral hearing loss disability, the critical question is whether an effective date prior to September 3, 1997, is warranted for the grant of service connection for the hearing loss disability.

As noted, the Veteran's claim for an earlier effective date for increased SMC turns on the effective date for the grant of entitlement to service connection for a bilateral hearing loss disability. 

"Unless specifically provided otherwise...the effective date of an award based on an original claim, a claim reopened after final adjudication, or a claim for increase, of compensation, dependency and indemnity compensation, or pension, shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of the application therefor." 38 U.S.C. § 5110(a) (2012). "The effective date of an award of disability compensation to a veteran shall be the day following the date of the veteran's discharge or release if application therefor is received within one year from such date of discharge or release." 38 U.S.C. § 5110(b)(1).

The May 2011 Board decision determined that VA first received from the Veteran communication that could be construed as a claim for entitlement to service connection for a bilateral hearing loss disability on September 3, 1997. The Veteran appealed to the Court as to several issues adjudicated by the Board in its May 2011 determination; however, he failed to appeal the determination as to the issue of entitlement to an earlier effective date for a bilateral hearing loss disability. As such, the effective date of September 3, 1997, assigned in the May 2011 Board determination became final. See 38 C.F.R. § 20.1100 (2017). 

There is no contention of clear and unmistakable error in the May 2011 Board determination with respect to the assigned effective date for the award of service connection for hearing loss or other basis for challenging the finality of the May 2011 Board determination.

The Board has no statutory or regulatory authority to assign an earlier effective date for an award of a higher level of SMC unless the effective date for the award of entitlement to service connection for a bilateral hearing loss disability was earlier than September 3, 1997. As discussed, there is no basis for assigning an effective date prior to September 3, 1997, for the award of entitlement to service connection for a bilateral hearing loss disability and, by extension, no basis for assigning an intermediate step under 38 C.F.R. § 3.350(f)(2)(v). The Board has considered whether an intermediate step or increased level of SMC could be awarded under any of the other relevant regulations, but finds no basis for such an award.

Accordingly, the claim for entitlement to an effective date prior to September 3, 1997, for the award of a higher level of SMC based on aid and attendance, is denied. As the preponderance of the evidence is against the claim, the benefit-of-the-doubt doctrine is not applicable. See 38 U.S.C. § 5107(b); Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990).


ORDER

Entitlement to service connection for a lung disability is denied.

Entitlement to a TDIU from March 27, 1981, to August 31, 1981, is granted, subject to the laws and regulations governing the payment of monetary awards.

Entitlement to a TDIU prior to March 27, 1981, is denied.

Entitlement to an effective date earlier than September 3, 1997, for increased SMC is denied.





______________________________________________
Robert E. P. Jones
Acting Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs